PASCAULT v. COCHRAN.

*(Circuit Court, D. Delaware. March 2, 1888.)*

1. MORTGAGES—RECITALS—CONCLUSIVENESS.
   A mortgage on land in Delaware, given as additional security for the purchase price of land in Maryland, was dated July 28, 1871, and recited that the deed from the vendor and the purchase-money mortgage bore date both, and were delivered both, on that day. *Held,* on bill to foreclose the Delaware mortgage, that the recital as to dates was not conclusive, and, it being shown that both mortgages and the deed were delivered, all three simultaneously, August 5, 1871, parol evidence was admissible to show that the three instruments formed one transaction.

2. DEED—OF BARGAIN AND SALE—OMISSION OF BARGAINEE—CONSTRUCTION.
   In Delaware, where the common mode of assurance is a deed of bargain and sale operating under the statute of uses, the words in a deed, "bargains and sells unto the sole and separate use of the said P.," will be construed, in equity, when the intention of the parties is clear, to mean "bargains and sells unto P., and to the only proper use and behoof of the said P.;" and such a deed will be reformed to carry that intention into effect.

3. VENDOR AND VENDEE—SURETY FOR VENDEE—RELEASE BY NEW CONTRACT.
   A deed, which contained the usual covenant for "further assurances," recited that grantors' title was under a certain will and proceedings in partition in orphans' court. As security for the purchase money a mortgage was taken on the land; and, as security for that mortgage, the purchaser's father gave a mortgage on other land of his own. After the deed and mortgages were delivered, it was discovered that the orphans' court had no jurisdiction to

make the allotment under the will. The vendors, who had a right to the fee-simple in the land, and who had made no intentional misrepresentations, thereupon, of their own motion, secured quitclaims from all interested, and made the purchaser a good title. *Held,* on bill to foreclose the mortgage from the father, that the father's obligation as surety was not discharged, it not being made to appear that he had suffered any loss or injury, and the execution of the "further assurance" not constituting a new contract.

4. SAME—FORECLOSURE OF PURCHASE-MONEY MORTGAGE—APPOINTMENT OF RECEIVER.

The maker of a mortgage given as additional security for the payment of a purchase-money mortgage is not discharged by the fact that a receiver has been appointed in the suit to foreclose the purchase-money mortgage at the instance of the mortgagee, and with the consent of the purchaser; such an appointment not changing the title to or creating any lien upon the land, or giving any advantage or priority to the mortgagee.

5. SAME—DEPRECIATION IN VALUE OF LAND.

A serious depreciation in the value of land after the time of its purchase, the vendor and vendee having bargained on equal terms, in the absence of proof of fraud, misrepresentation, or concealment of any material fact on the part of the vendor, by which the purchaser was betrayed into an unfortunate speculation, will not discharge the surety of the latter.

In Equity. Bill to foreclose a mortgage.
*Philip F. Thomas* and *Wm. C. Spruance,* for complainant.
*Alexander B. Cooper* and *George Gray,* for respondent.

WALES, J. This is a suit to foreclose a mortgage given by William A. Cochran, the defendant, to Catharine H. Pascault, the complainant, as additional security for the payment of $40,000, that sum being the purchase money of a farm in Cecil county, Md., called "Greenfield," containing about 288 acres of land, which the complainant and her husband (now deceased) had sold and conveyed to Henry S. Cochran, the son of the defendant. The history of the case, as gathered from the bill, answer, and proofs, is as follows: In the early summer of 1871, the complainant, being the owner in her own right of 272 acres of "Greenfield," and her husband owning the remaining portion, they entered into negotiations with Henry S. Cochran and William A. Cochran for the sale of the farm, and it was finally agreed that Henry S. Cochran would become the purchaser for $40,000. As the sale was entirely on credit, no cash payments being required or offered, it was further agreed that, in addition to Henry S. Cochran's mortgage of "Greenfield" for the whole amount of the purchase money, the defendant should also give a mortgage of his farm on which he was then residing, in New Castle county, Del. In pursuance of this agreement, the complainant and her husband, by deed dated August 5, 1871, conveyed "Greenfield" to Henry S. Cochran, and the latter at the same time gave his mortgage of like date, to the complainant. On the same day, and at the same place, to-wit, on the 5th of August, at the town of Elkton, where and when the transaction just mentioned took place, the mortgage of William A. Cochran, the defendant, and his wife, dated the 28th of July, 1871, was delivered to the complainant. The deed and the two mortgages were all intended to be of even date, the mortgage of the defendant, as alleged in the bill, being a part of the consideration, without which the conveyance

to Henry S. Cochran would not have been made. The principal debt was made payable by installments, at intervals of two years, beginning on the 1st of January, 1872, with interest payable half-yearly, the last of the installments not falling due until January 1, 1892. Henry S. Cochran failing to pay the interest on his debt after the 1st of January, 1877, and, having made default in the payment of all of the installments of principal due up to that time, the complainant, by her husband and next friend, on the 20th of August, 1878, brought a suit in the equity side of the circuit court for Cecil county, praying for a decree of sale under the "Greenfield" mortgage to satisfy her claim. This suit was resisted by Henry S. Cochran, who filed a cross-bill alleging that the complainant and her husband, at the time of their conveyance of "Greenfield" to him, did not have a legal title to the same, and praying that his mortgage might be canceled, and he be released. Thereupon the complainant and her husband tendered to Henry S. Cochran a deed, dated October 26, 1878, perfecting the title, and curing the alleged defect, which he refused to accept. On the 11th of June, 1879, a decree was rendered by the court dismissing the cross-bill, and directing a sale of the mortgaged premises on a day named, unless the claim of the complainant should be satisfied; and in that event the decree should stand as security for the payment of future installments. This decree was appealed from, and so much thereof as dismissed the cross-bill was affirmed by the court of appeals of Maryland.[1] "Greenfield" was afterwards sold under the order of the circuit court, which distributed the proceeds of sale, and, after deducting credits arising from this source, there is now due from Henry S. Cochran four installments of principal, with interest, making the aggregate sum of $25,766.35. After filing her bill, on the 20th of August, 1878, but prior to the decree thereunder, the court, upon the application of the complainant, and with the consent of Henry S. Cochran, appointed a receiver of the rents and profits of "Greenfield," pending the suit. William A. Cochran was duly notified of his son's default, and requested to make it good, and was also informed of the legal proceedings in Maryland, and advised to take such measures as he saw fit to protect his interests. Henry S. Cochran is insolvent. So far the facts are undisputed. The bill prays that an account may be taken of the amount due to the complainant under the mortgage of Henry S. Cochran and payable by the said William A. Cochran under the terms of his mortgage, and for a decree against William A. Cochran, the defendant, to pay the same, with costs, by a day to be named in the decree, and in default thereof that the lands mortgaged by the defendant be decreed to be sold for the amount found to be due, and that the said decree may stand as security for the other installments of principal and interest payable by the said Henry S. Cochran as the same shall respectively mature.

In behalf of the defendant it is contended that he is not liable as surety for the performance by his son of the latter's contract with the complain-

[1] 54 Md. 1.

ant, of August 5, 1871, because the mortgage now in suit was given to secure the performance of another and different contract, to-wit, one bearing date the 28th of July, 1871. The defendant insists upon his strict right to stand upon the precise terms of his guaranty as a surety, and without doubt he is entitled to have his claims, in this respect, fairly considered. His mortgage to the complainant sets out with the following recital:

"Whereas, the said Francis Pascault and Catharine C. Pascault by deed dated the 28th day of July, 1871, conveyed the land and premises in Cecil county, Maryland, therein described, unto Henry Cochran, and took from said Henry Cochran and Annie, his wife, a deed of mortgage of the same lands to secure the payment of forty thousand dollars, the purchase money therefor, in installments as therein set forth, [then follows the conveyance from W. A. C. and wife to C. C. P.:] provided, that if the said Henry Cochran, his heirs and assigns, pay and satisfy the said purchase money of forty thousand dollars and interest in installments as the same become due and payable, then this deed to be void."

The reply to this defense is twofold—*First*, that the defendant's mortgage, although dated on the 28th of July, was not delivered to the complainant until the 5th of August, from which last day only it took effect; and, *secondly*, that parol evidence being admissible to prove and correct a mistake in the recital of a deed, it has been conclusively shown that the deed and mortgage of August 5th are the identical ones referred to in the defendant's mortgage of July 28th, and that this fact was well known to the defendant at the time of the delivery of the instruments, and subsequently confirmed by his own admissions. On the question of delivery the testimony of the parties is contradictory, the complainant being clear and positive in her recollection that the defendant's mortgage was handed to her for the first time on the 5th of August, while the defendant states that immediately on the execution of his mortgage, on the day of its date, he delivered it to the complainant's husband, who, as her agent, was authorized to receive and accept it. The mortgage now in suit was signed and acknowledged at the defendant's residence, in Delaware. Mr. Pascault and the defendant's wife, who were present, are both dead. Henry S. Cochran, who was also present, has not been called as a witness, and the notary who took the acknowledgment testifies that several years afterwards the defendant asked him what he (the defendant) did with the mortgage on the day of its execution, thus indicating some doubt in his own mind about the actual disposition of the paper. The complainant admits that her husband was employed by her to conduct the sale of "Greenfield," but that nothing was done in relation to it without her knowledge and consent. Assuming, therefore, that the complainant, being at the time a *feme covert*, had the power to authorize her husband to accept the mortgage, there is no evidence that she delegated this special authority to him, or that she had knowledge of the delivery at that time, and ratified it. Under such circumstances, as was remarked by an eminent judge in a recent case, (*Blair* v. *Shaeffer*, 33 Fed. Rep. 227,) "regard must be had to the inherent probabilities based upon the situation of the parties." It must always be remembered,· for the proof is clear on this point,

that the defendant bore an active part in all the negotiations which led up to the sale of "Greenfield," that he met his son, on more than one occasion, at "Greenfield," in the presence of the complainant and her husband, when the subject of the sale and its terms were under consideration; that he executed his mortgage promptly, and without questioning, on the day it was submitted to him for that purpose, showing that the whole business had been prearranged and was fully understood; and finally that he met the parties at Elkton, on the 5th of August, when the sale was consummated by the exchange and delivery of the deed and the two mortgages. These facts are all in harmony with the complainant's declaration that she saw the defendant's mortgage for the first time on the day it was delivered to her, and it is by no means an improbable inference that the defendant or his son had kept possession of it up to that time. It is not uncommon for a deed of conveyance and of a mortgage for the purchase money to be of different dates. Each takes effect, however, as a general rule, from the time of its delivery. The date is only presumptive evidence of the time of delivery, but the presumption may be rebutted by parol, and, when this has been done, the deed and mortgage are regarded as parts of the same transaction. *Marbury* v. *Brien*, 15 Pet. 21; *Parmelee* v. *Simpson*, 5 Wall. 81; *Lamb* v. *Cannon*, 38 N. J. Law, 362; *Porter* v. *Buckingham*, 2 Har. (Del.) 197; 1 Jones, Mortg. § 84; 1 Greenl. Ev. § 568a, note.

In *Hall* v. *Cazenove*, 4 East, 481, Lord ELLENBOROUGH said:

"It is quite immaterial when it (the deed) was indented, and equally so when it was made, by which it may be understood it was written. Then the only material word is 'concluded,' and a deed can only be said to be concluded when it is delivered. The time of delivery is the important time when it takes its effect as a deed."

And such has always been the law. There being satisfactory evidence that the intention of all the parties was that the defendant's mortgage was to be given, at the time of the sale, as additional security for the purchase money of "Greenfield," the circumstantial proof of its delivery on the 5th of August is equally conclusive, and it became valid and effectual from that day, and not before.

The time of delivery being ascertained, there is still less difficulty in applying this mortgage to the purpose for which it was given. The rule that parol evidence is inadmissible to contradict or vary the terms of a written contract, is founded on the presumption that the whole engagement of the parties and the extent and manner of their undertaking, were reduced to writing, and that therefore any oral testimony of a previous *colloquium*, or of conversations or declarations at the time when it was completed, or afterwards, would tend to substitute a new and different contract for the one which was really agreed upon, to the possible prejudice of one of the parties. But there are well-recognized exceptions to this general rule, and it has been well settled by repeated adjudications that parol evidence will be admitted to contradict or explain an instrument in some of its recitals of facts. 1 Greenl. Ev. § 285, and notes. Thus in *Hall* v. *Cazenove, supra*, the plaintiff was permitted to prove that a deed

was made and concluded on a day subsequent to that on which the deed itself stated on the face of it to have been made. In *Johns* v. *Church*, 12 Pick. 559, the recital in a mortgage called for a note of $236, and the note offered in evidence was for $256. Parol proof was admitted to prove that the note produced was the one referred to in the mortgage. In *Hall* v. *Turell*, 18 Pick. 455, there was a discrepancy between the note recited in the mortgage and the one produced, and evidence was allowed to show a mistake in date, also that there was no other note between the parties, and that the note offered was the one referred to in the mortgage. The court there held that parol proof of such facts came within the principle of parcel, or not, of the premises intended to be conveyed. So, in *Hough* v. *Bailey*, 32 Conn. 292, parol proof was admitted to prove the identity of the note recited in the mortgage. In *Jones* v. *Indemnity Co.*, 101 U. S. 622, the court, speaking through Mr. Justice SWAYNE, says:

"It is common learning in the law that parol evidence is admissible to show that a deed absolute on its face is a mortgage; to establish a resulting trust; to show that a written contract was without consideration; that it was void for fraud, illegality, or the disability of a party; that it was modified as to the time, place, or manner of performance, or otherwise; also to show the situation of the parties, and the surrounding circumstances, when it was entered into, and to apply it to its subject. * * * These are but a small part of the functions which such evidence is permitted to perform."

In support of the judgment of the court in that case he cites *Sheirras* v. *Craig*, 7 Cranch, 34, where Chief Justice MARSHALL says:

"It is true that the real transaction does not appear on the face of the mortgage, * * * but if, on investigation, the real transaction shall appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed of his real equitable rights, unless it be in favor of a person who has been in fact injured by the misrepresentation."

Parol evidence to identify the subject-matter of a written instrument is always admitted. De Coly. Guar. 156; Id. 180, 181.

There is no pretense that it was not the intention of the defendant to become a surety for his son, nor is it disputed that a deed takes effect from the time of its delivery only, but it is claimed that the actual delivery of defendant's mortgage was on the day of its date, and that it cannot be made by parol proof to apply to his son's mortgage of a subsequent date. The evidence does not sustain this contention. There can be no reasonable doubt that defendant's mortgage was delivered on the 5th of August, that it took effect on and from that day, and that it was contemporaneous with the execution and delivery of the instruments mentioned in its recital. And the law is equally clear that parol proof may be admitted to contradict or explain the erroneous recitals in a deed, whenever it becomes necessary, in order to ascertain the real transaction between the parties.

The defendant also relies on the defective title of complainant and her husband to relieve him from liability. It is admitted that on August 5, 1871, Mrs. Pascault and her husband did not possess the legal title to "Greenfield," or to any part of it, but it is not disputed that she and

her husband had at that time a right to a fee-simple title in the premises conveyed; that there was no intentional misrepresentation of any fact on her part; and that the origin and description of the title were fully recited in their deed to Henry S. Cochran. The Pascaults' deed sets out that their title was under the will of Mrs. Pascault's mother, and proceedings in partition in the orphans' court of Baltimore city, Mr. Pascault having bought his portion of "Greenfield" from one of the devisees; but it turned out that the orphans' court had no jurisdiction to make an allotment under the will; and as soon as the defect was discovered, the complainant and her husband obtained a conveyance from all the other parties interested, by which the legal title was vested in them, and they then executed and tendered a deed for the same to Henry S. Cochran. The deed of August 5th contained a covenant on the part of the grantors to "execute and deliver or procure to be executed and delivered such other and further assurances as may be necessary to secure said lands." The court of appeals of Maryland decided that the new deed, dated October 26, 1878, cured all defects of title; holding that there had been no fraudulent intent or purpose on the part of the vendors; that Henry S. Cochran had suffered no injury or damage by the defect; and from the fact that the source of title was disclosed to the vendee, as stated on the face of the deed, it was evident that both parties supposed the partition referred to was valid and effectual to convey in severalty the parts allotted to the several devisees, and that therefore it was a case of mutual mistake as to a question of law. *Cochran* v. *Pascault*, 54 Md. 1. The opinion of the court in that case is an able one, and is conclusive of the question of title between the parties to it, and the counsel for the defendant here do not seek to controvert the correctness of the decision. The defense on this point is that under the deed and mortgage of August 5th there was really no contract created between the complainant and Henry S. Cochran, because at that time a fee-simple title had not been conveyed to him, and therefore no obligation existed on his part for the payment of the purchase money, and that it was not until "a new and distinct agreement" had been made between the creditor and the principal debtor, by which the title to "Greenfield" was really conveyed, that the obligation to pay the purchase money became valid; that the conveyance of the fee by the deed of August 5th was the consideration of the defendant's guaranty, and the failure of that consideration discharged him as surety. It will be noticed that this branch of the defense assumes two things,—that Henry S. Cochran was not liable under his mortgage, because no debt had been created by it, and that before he could be made so liable it became necessary to make a new and distinct contract between him and the complainant,—which was a variation from the terms of the original one. In *Miller* v. *Stewart*, 9 Wheat. 681, the rule governing the liability of sureties is lucidly and concisely stated by Mr. Justice STORY, who, speaking for the court, said:

"Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended by implication beyond the terms of his contract. To the extent, and in the manner, and under the

circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may be even for his benefit. He has a right to stand upon the very terms of his contract, and if he does not consent to any variation of it, and a variation is made, it is fatal. And courts of equity, as well as of law, have been in the constant habit of scanning the contracts of sureties with considerable strictness. * * * All the authorities proceed upon the ground that the undertaking of the surety is to receive a strict interpretation, and is not to be extended beyond the fair scope of its terms."

The opinion of the court in that case was not unanimous, but the concluding sentence may be accepted as formulating the general rule.

Now, what were the precise terms of the defendant's guaranty? Simply, that in consideration of the conveyance by the complainant and her husband of "Greenfield" to Henry S. Cochran, and of the latter's mortgage for the payment of the purchase money, the defendant became a guarantor for the payment of that mortgage, according to the terms and conditions of the contract between Henry S. Cochran and the complainant. It is urged on behalf of the defendant that his contract was made on the basis of a fee-simple title having been conveyed by the deed of August 5th, and, as that was not done until long afterwards, he should be discharged. But this argument takes no account of the covenant for further assurances. It is not denied that at the date of the first deed the grantors did not possess the legal title, although they had the right to have such a title. What they did grant by the first deed was all the title and right they then possessed, believing that they held the fee, but, to guard against all mistake, and to provide for the curing of all defects, they, at the same time, and by the same instrument, covenanted with Henry S. Cochran, his heirs and assigns, to make such further assurances as might become necessary to secure a good title. The deed of October 26, 1878, was in fact nothing more than a carrying out of the original agreement,—a performance of the covenant that if the deed of August 5th should prove to be insufficient to convey a fee, the complainant and her husband would make it good by another conveyance. They did voluntarily what they could have been compelled to do by a court of equity on a bill for a specific performance of their covenant, equity holding that to be done which the parties had agreed should be done. It cannot be truthfully asserted that the deed of October 26th was a variation from the original contract between the grantors and grantee of "Greenfield," when it was actually made in compliance with the terms of that contract, which otherwise would have been violated by the refusal or the inability of the grantors to execute and deliver that deed. The covenant for further assurances was an essential part of the first deed, and bound all the parties to it. Such a covenant has always been held to be of great value to a purchaser. It relates both to the title of the vendor, and to the instrument of conveyance to the vendee; and operates as well to secure the performance of all acts for supplying any defects in the former, as to remove all objections to the sufficiency and security of the latter. It runs with the land whenever there is a privity of estate between the contracting parties, and inures, not only to the ben-

efit of the first purchaser, but to all who take title from him. Platt, Cov. 340-461. Judge MILLER, in *Cochran* v. *Pascault, supra,* in considering the effect of this covenant in the Pascaults' deed of August 5th, says:

"In the present case, however, there was no demand for a specific performance; but the vendors, acting voluntarily under their covenant, and at their own cost, effectually cured the defect before the bill for rescission could be brought to a hearing. It seems to us there is an element of mutuality in such a covenant, and that in this case the parties, by giving and receiving a deed with these recitals and this covenant, must have contemplated this very action on the part of the vendors. The covenant, while it secured the vendee a right of action at law for damages for breach of it, and a right to enforce in equity its specific performance, gave to the vendors the right, if they so chose, to act under it voluntarily, as they have done, and to cure the defect in the recited title as soon as it was discovered. We have no doubt whatever of their right so to act; and without considering other grounds of objection to the cross-bill, we hold that the curing of the defective title is a complete bar to the relief it prays for, unless the complainants have shown that they have suffered 'some loss, injury, or damage by the delay in perfecting the title.'"

The reasons assigned for the judgment of the court in that case are consistent with good sense and sound law. The vendee was attempting to repudiate a debt on account of an alleged defect in the contract by which it had been created, but the court justly held that as the contract had provided for the curing of such defect, and the same had been cured without any loss or damage to the vendee, the latter could not be released. How, then, can the vendee's surety be discharged? On the strictest interpretation of his undertaking, will it, in the language of Judge STORY, be extending it beyond the fair scope of its terms to hold him liable? There was, as has been shown, actually no such variation in the original contract between the creditor and the principal debtor as would discharge the surety under the rule laid down by the supreme court in *Miller* v. *Stewart.* Nothing was done for his benefit or injury, and he suffered no loss or damage. What might have been his position had the original contract between the complainant and Henry S. Cochran never been carried out and completed, is a different question; but, looking at existing facts, and not considering contingencies which never happened, it does not appear that the relations between the parties were changed by the deed of October 26th in such manner, or to such an extent, as to justify a court of equity in discharging the surety.

Another objection urged in behalf of the defendant is that the appointment of a receiver, at the instance of the complainant, and with the consent of Henry S. Cochran, during the pendency of the suit in Maryland, by which Henry S. Cochran was to be considered as a tenant, and not as the owner, of "Greenfield," to which appointment this defendant was not a party, and gave no consent, express or implied, discharges him. But how could this appointment have operated to endanger the rights of the defendant, or change the degree of his responsibility in any respect as a surety? It was the duty of the complainant to enforce the payment of the original debt. It was for the interest of the defendant that she

should do so; and, had she been remiss in the performance of that duty, the defendant would have had just cause for exception. Instead of allowing the debt and interest to accumulate, and the property to deteriorate by mismanagement or waste, the mortgage of Henry S. Cochran was put in suit, and to preserve the property the court took possession of it through a receiver, who received the rents and profits, and accounted for them after a final decree had been obtained. Such a receiver is uniformly regarded as the officer of the court, exercising his functions in the interest of neither plaintiff nor defendant, but for the common benefit of all parties in interest. Being an officer of the court, the fund or property intrusted to his care is regarded as being *in custodia legis*, for the benefit of whoever may eventually establish title thereto; the court itself having the care of the property by its receiver, who is merely its creature or officer, having no powers other than those conferred upon him by the order of his appointment, or such as are derived from the established practice of courts of equity. The purpose for which a receiver takes possession is closely allied to that of a sheriff in levying under execution, except that the scope of the receiver's authority is more comprehensive, since he is usually required to pay all demands upon the fund in his hands to the extent of that fund; and it has been held that the appointment of a receiver is, in effect, an equitable execution. It does not change the title to, or create any lien upon, the property, and ordinarily gives no advantage or priority to the person at whose instance the appointment is made over other parties in interest. High, Rec. §§ 1, 2, 5. The defendant had notice of the proceedings in the Maryland suit, and could have had full knowledge of all that transpired during their progress. He could have intervened had he chosen to do so, but neither his omission to interfere, or the want of his consent to the appointment, makes any difference. It is enough to say that the appointment and action of the receiver in no way affected his right as surety.

A final objection is that the defendant's mortgage, purporting to be a deed of bargain and sale, which is the common mode of assurance in Delaware, and operates under the statute of uses, does not contain the name of a bargainee. The grantor "bargains and sells unto the sole and separate use of the said Catharine C. Pascault," and not to C. C. P., and to the only use and behoof of the said C. C. P., and therefore it is alleged no use is effectually raised to draw the legal estate out of the bargainor. The mortgage is clumsily drawn, but the intention of the parties to it is manifestly clear, and it is the province of a court of equity to reform a deed, so that it will conform to the intention, unless controlled by the use of technical words which cannot be set aside. Here the land was conveyed to the sole and separate use of the complainant, which by force of the statute attaches the possession, and the *cestui que use* becomes the complete owner, both at law and in equity. Even if the construction of the defendant's counsel was the true one, it would be a gross perversion of justice to overthrow a deed on account of an obviously clerical omission which this court would have the power to rectify.

In the course of their argument counsel discussed several questions

which have not been adverted to in the foregoing opinion, under the belief that sufficient reasons have already been assigned for the judgment of the court. The doctrine that a surety is a favored debtor was brought prominently into view, as well as the hardship of the defendant's position in being compelled to answer for a debt from which he had not and could not have derived any benefit. It is a mistake, however, to suppose that by "favor" is meant "partiality," or any exclusion of a due consideration of the rights of others. The meaning is, as stated by Justice STORY, that the surety's undertaking is to receive a strict interpretation, and must not be extended beyond the fair scope of its terms. When a surety has deliberately and voluntarily contracted to answer for the default of another, without having been deceived or misled by the representations of the creditor, and there has been no departure from the terms of the contract, he cannot be released from his obligation. He must first satisfy the court that, on some legal or equitable ground, he is entitled to be discharged. The creditor also has the right, when he has parted with his money or property on the faith of the surety's guaranty, to be saved from loss, and will receive equal protection from the court. The peculiar hardship in the present case grows out of the serious depreciation in the value of real estate in Cecil county since the sale of "Greenfield." But the purchaser and his surety were not ignorant or inexperienced persons when they made the bargain. They stood on equal terms with the vendors. No charge of fraud, misrepresentation, or concealment of any material fact on the part of the vendors, by which the purchaser was betrayed into an unfortunate speculation, has been proved. The question in such cases always is, was the contract a reasonable and fair one at the time it was made? If such was the fact, the parties are considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property. *Willard* v. *Tayloe*, 8 Wall. 571. The adoption of a different rule would open the door to endless confusion and litigation.

Let a decree be entered for the complainant.