## POLLIN v. PERKINS

[No. 59, September Term, 1960.]

534

*Decided December 8, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett & Powers* on the brief, for appellant.

*T. Hammond Welsh, Jr.,* with whom were *Welsh, Dyer and Lancaster* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal by Morris Pollin alone from a decree against him and Jennie Pollin, his wife, for the specific performance of a contract or contracts, consisting of an original agreement and amendments or modifications thereof below referred to, for the sale of certain real estate at Greenbelt, in Prince George's County. The land in question was owned by Jennie Pollin and by one Eugene M. Howerdd, Jr. as tenants in common, each owning a one-half undivided interest. Pollin's sole claim of interest in it was his inchoate right of dower, the statutory "husband's dower" under Code (1957), Art. 45, § 7. Mr. Howerdd and his wife were joined as parties to the suit, but as they were apparently at all times ready and

willing to go through with the contract, as revised, and did so before the case was tried, the decree was against the Pollins only. Mrs. Pollin did not appeal.

The property in question consisted initially of approximately four hundred acres, a part of which (about thirty-eight acres) had been granted to the State Roads Commission for a right of way and was excluded from the tract covered by the contracts here involved. All of this land had originally been zoned R-R, "Rural Residential", but some 280 acres or more had been rezoned during the Pollin-Howerdd ownership as "Industrial", being intended for such use in some project that fell through. This part of the tract comprised, it was agreed, about two-thirds of the property covered by the contracts in issue.

The initial contract of sale was dated June 16, 1958, was finally executed by all parties by July 9, and was almost immediately amended by an agreement dated July 9, and finally executed by all parties on July 12, 1958. Both the Pollins and both the Howerdds joined in the execution of these documents and they were also duly signed by Edward M. Perkins, the purchaser, who is the plaintiff-appellee in this suit.

The initial contract and its nearly simultaneous amendment may be treated as a single instrument for purposes of this opinion and will be referred to collectively as the "original contract." It provided, among other things, for an aggregate purchase price of $595,000, an initial deposit of $5,000, a further deposit of $20,000 within 60 days from the date of acceptance by the sellers and for settlement within 180 days from the date of acceptance. Failure of the purchaser to make the $20,000 deposit within 60 days would result in forfeiture of the initial deposit and termination of the contract.

Soon after the execution of the original contract, Perkins, who was in the business of building houses, learned that under the Industrial zoning classification then applicable to 280 acres or more of the tract, that portion of the property could not be used for residential construction. The sellers were apparently also unaware of this restriction. Negotiations were instituted between Perkins, the real estate brokers and the

Pollins [1] to provide for an extension of time for the $20,000 deposit and an extension of time for settlement, so that the zoning situation could be met. At this time all participants in the negotiations were eager to find a solution and to have the contract carried into effect. There is some dispute as to whether these negotiations began before or after Mr. and Mrs. Morris Pollin left for a trip to Europe, from which they returned about October 16, 1958. It seems to make no real difference on this appeal which version is correct.

During the absence of Mr. and Mrs. Morris Pollin in Europe two documents were executed as a result of the negotiations. One was a letter to Perkins signed by Abe Pollin as "Agent for Jennie Pollin and Eugene M. Howerdd, Jr., Sellers," extending the time for the $20,000 deposit to September 17, 1958, which was "acknowledged" by Perkins. This will be referred to as the "extension." The second was a document purporting to amend the original agreement. It was signed by Perkins, as Purchaser, by the real estate brokerage firm, and by Abe Pollin and Jack Pollin as "Agent for Jennie Pollin and Eugene M. Howerdd, Jr., Sellers." This we shall call the "amendment." The first draft thereof was prepared by one of the real estate agents, and it was revised to some extent prior to final execution by Perkins and by Washington counsel for the Pollins. Abe and Jack Pollin are sons of Mr. and Mrs. Morris Pollin and have been associated in business with their father. The amendment provided: first, that the settlement date should be extended to not later than March 15, 1959 (instead of January 2); second, that the purchaser should have the right to apply for rezoning to residential use of any part of the property prior to settlement, that "all applications for rezoning shall be submitted first to the sellers for their consideration and approval, and seller to approve any reasonable application"; third, that "[u]pon approval by the sellers of the zoning applications the sellers shall sign the same, however, purchaser shall pay all costs of said rezoning"; fourth, that the purchaser should immediately deposit an additional

---

1. The Howerdds were non-residents and one or more of the Pollins appear to have acted for them in these negotiations.

$20,000 with the real estate agent, and that the entire deposit ($20,000 plus the original $5,000) should forthwith be delivered to the sellers; and fifth, that if the purchaser did "not secure said rezoning, the purchaser, at his option, may terminate this contract," in which event the $25,000 deposit should be paid over, $7,500 to the sellers, $2,500 to the real estate agents and $15,000 to the purchaser.

At the end of October, one of the real estate agents left at the office of the Pollins (the appellant and his sons) an application for rezoning for apartment use the 280 acres or more previously zoned as industrial. This was the first time the Pollins had known that Perkins intended to build apartments rather than houses, a fact which Perkins had not cared to disclose to them previously. The Pollins were apartment house developers themselves and it is not beyond the realm of possibility that they wished to participate in any such development of this property or that they did not relish Perkins' competition. Whether for either of these reasons or because, as they said, they thought the application unreasonable, or perhaps for all three reasons, two of the younger Pollins became quite excited over the matter. Both sides agree that there was some discussion of a further agreement or understanding between the Pollins and Perkins before the sellers signed the application and delivered it to Perkins for filing, though Perkins claimed that its execution and delivery were promised, regardless of whether any such agreement might be reached. The Pollins claim that the proposed application jeopardized performance of the contract and risked "freezing" the zoning of the property for a year, if the application were denied. Perkins said that he had been advised by his counsel and land planners to "ask for the moon" and he took the position that if he did not get all that he asked, he might get at least some part of the property rezoned. It appears that the Pollins did not then communicate their fears to the Howerdds, but submitted the application to them and obtained their signatures. The Pollins claim that Perkins agreed to give them some share in the real estate or in the venture if the application were granted in whole or in part. Perkins says he agreed only to give them an opportunity to participate in the financing,

should he later find himself in need of further assistance along that line. Both Mr. and Mrs. Morris Pollin did sign the rezoning application and it was delivered to Perkins. There was no written agreement as to any terms or conditions upon which it was so executed and delivered. The application was subsequently granted in full by the Board of County Commissioners.

Abe Pollin testified that after the rezoning had so been approved in full, he then informed the Howerdds of the agreement which the Pollins claimed to have made with Perkins and that it was his intention to include the Howerdds in the benefits of that agreement. At the same time he sought (unsuccessfully) to enlist the support of the Howerdds in refusing to convey and in seeking to force Perkins to comply with the alleged oral agreement.

The Chancellor held that the appellant had adopted both the interim extension of September 6, 1958, and the amendment of September 12, 1958, and we think that he was right in so holding. Mr. Pollin testified that he was informed of these documents on his return from Europe in October. As to the extension, his testimony was that it was "perfectly all right, whatever they [his sons had] done." As to the amendment, he was asked: "You never questioned this agreement, did you?" He replied: "Never did, no, because we know we signed it." A recognition that his sons were his agents with regard to these documents (even though they had not so represented themselves) and that he had ratified their actions presumably motivated Mr. Pollin's acknowledgment of these documents as his agreements. His recorded testimony adopting them is, however, of itself sufficient to satisfy the requirements of the Statute of Frauds. *Trossbach v. Trossbach,* 185 Md. 47, 52-53, 55, 42 A. 2d 905; *Sealock v. Hackley,* 186 Md. 49, 45 A. 2d 744. We quote from the latter (186 Md. at 52-53): "As stated in *Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905, the admissions of a party in the form of testimony constitute sufficient 'memoranda' or 'writings' under the Statute of Frauds, for recorded testimony is regarded as equivalent to signed depositions. * * * Admissions of a party in testifying, while evidence in form, are in essence not

mere evidence, but make evidence against him unnecessary." This was no case of mere passive acquiescence on the part of the holder of an inchoate dower right, as in *Alvey v. Alvey*, 220 Md. 571, 155 A. 2d 491. In reaching the conclusion that Morris Pollin did adopt these documents and is bound by them, we do so on the basis of the *Trossbach* and *Sealock* cases, without regard to questions of equitable estoppel or agency. Mr. Pollin's testimony with regard to his adoption of these documents, we may add, was in full accord with his conduct after he was informed of their terms upon his return from Europe.

The primary theory of the appellant's defense set up in his answer, as we understand it, was that he was not bound by the extension and the amendment because he was not a party to these instruments either directly or through an agent or agents. He states early in his brief, "Appellant's position in this case rests upon a broad moral and equitable base, though on a rather narrow legal one. The legal one is that the basic contract and first amendment, signed by appellant, were substantially changed by the subsequent amendments, neither of which was signed by, or in behalf of the appellant." What we have just held with regard to the appellant's adoption of the extension and amendment rejects the "rather narrow legal" base for the appellant's position. We could wish that his "broad moral and equitable base" were stated with greater precision. The thing to which the appellant objects in his brief is "the Chancellor's application of the law of estoppel."

We repeat that we do not decide (nor do we think that the Chancellor decided) that the appellant is bound by the extension and the amendment on the basis of estoppel. His conclusion was "that Mr. Pollin is bound by his adoption of this bargain and that he is estopped to refuse to go forward with the contract by reason of his concurrence in the application for rezoning." As to the latter the Chancellor took the view that Mr. Pollin, by reason of having signed the zoning application and having so permitted Perkins to incur the risks and expenditures of time, effort and money involved in pressing the application, was estopped from refusing to go forward with the contract, unless he was entitled to have Perkins carry

out an alleged agreement to give him some interest in the land or venture. The Chancellor then pointed out the two different Pollin versions of the agreement which they asserted and held that the alleged bargain exacted from Perkins was so uncertain as to be unenforceable and that it was not "possible to determine what their bargain was, if there was a bargain."

The Chancellor had already mentioned the difficulty presented by the Statute of Frauds, if the alleged contract were for the conveyance of real estate and the vagueness of the alleged agreement if it were for some interest in an apartment house venture. To this we may add that a serious problem with regard to the latter might arise under Code (1957), Art. 83, Sec. 22 (1), the Statute of Frauds section of the Sales Act, which differs from the 17th Section of the English Statute of Frauds (29 Car. II, Ch. 3) by expressly including contracts for the sale of choses in action. (Cf. *Webb v. Baltimore and E. S. R. Co.*, 77 Md. 92, 26 A. 113, decided prior to the enactment of the Sales Act.)

The appellant concedes, as we think he must, that no enforceable agreement arose from the conversations between the Pollins and Perkins with regard to the signing and delivery of the rezoning application. That was why he did not seek by answer, cross-bill or otherwise to enforce the alleged verbal agreement. The main thrust of his argument, as we understand it, is that because of a genuine dispute between him and his sons on the one side and Perkins on the other as to whether the rezoning application was or was not unreasonable, his signing and delivering the rezoning application did not estop him from denying that he was bound by the extension and the amendment, which he had not signed. Because of our holding that he is bound by his own adoption of those documents, this argument (if we understand it correctly) seems to be of no significant effect.

As we understand the appellant's argument, it did not in the trial court, and it does not here, go to the extent of contending that the concededly unenforceable alleged verbal agreement affords an excuse for non-performance of the contract. If it did, we are confident that this contention would

have been raised in the answer of each of the Pollins and would have been pressed in the trial court. It would obviously have been as available as a defense to Mrs. Pollin (the real owner of a half interest in the property) as to Mr. Pollin (the holder of only an inchoate right of dower therein), and we should find it difficult to find any explanation for Mrs. Pollin's declining to appeal on such a common ground of defense if Mr. Pollin were doing so. We mention the matter because some language in the appellant's brief may suggest such an argument, but it certainly does not spell it out. We may observe that such an argument, if made and if sound, would seem to produce a practical result in this case tantamount to the specific enforcement of an unenforceable agreement. We do not, however, undertake to decide the matter, since we think it is not properly before us. Md. Rule 885.

Nor do we think it necessary to rest our ultimate decision on the estoppel alleged against Mr. Pollin by reason of his having signed the rezoning application, which estoppel would bar his refusal to join in a deed. Assuming, without deciding, that no such estoppel was created against him, we think the question is whether or not Mr. Pollin has shown any valid reason for being excused from his obligation under the contract to join in the execution of a deed which would operate to release his dower interest. This does not turn on the question of whether or not Mr. Pollin had reason, in good faith, to dispute the reasonableness of the rezoning application. Such a question might have been relevant (and is perhaps suggested by the same portion of the appellant's brief referred to in the preceding paragraph), if we were concerned with an allegedly valid, amended contract which would have altered the previous contract, and with the consideration for such an amended contract; but concededly there was no valid amendment or valid new contract.

In the absence of such an amendment and without regard to any questions of waiver or estoppel, the questions seem to be: first, was the rezoning application unreasonable, so that the appellant was not bound to sign it; and second, if so (and regardless of the fact that he did sign it), would the appellant be relieved of his obligation to join in the execution of a

deed? The appellant has raised the first of these questions, though perhaps from a different viewpoint; but we do not think that he has raised the second—at least not in the form just stated—and we do not wish to impute to him a contention which he has not made. In any event, because of our conclusion stated below on the question of the reasonableness of the application, we do not reach the second of the above questions.

The Chancellor construed the contract as entitling the sellers to refuse to sign a rezoning application only if it were unreasonable in fact. This construction has not been challenged and is therefore not in issue. Applying that construction to the facts before him, he took the view that the granting of the full rezoning requested was a complete answer to the charge of unreasonableness, since it was to be assumed that the public body charged with responsibility to the public in the matter would not grant the rezoning without careful consideration and study. Undoubtedly, as the appellant contends, this was a matter of hindsight. On the other hand, the possibility of obtaining a rezoning for a lesser number of acres than the total sought was a factor before the parties at the time of their discussion and there is nothing to indicate that the grant of only a lesser rezoning would have jeopardized the contract or would have hurt the sellers in respect of the part as to which rezoning might not have been granted. The property appears to have been on the market about three years, the industrial zoning had been due to a reclassification sought by the sellers after they had acquired title, and all parties wanted the contract to go through. Some of the testimony seems to suggest that the Pollins simply wanted more than they had originally bargained for and saw a possible way to get it. The Chancellor pointed out such a possible view of the matter, but he did not make such a finding and we do not undertake to do so. It is enough for us to state that we should not be warranted in holding that the Chancellor was clearly in error in finding from the evidence that the requested rezoning was not unreasonable in fact; and thus no basis for reversal on this ground is presented. Md. Rule 886 a. We, therefore, do not reach the question of the possible effect of

unreasonableness of the application upon the obligation to join in the deed.

It remains only to refer to two well established rules. First, although the granting of specific performance lies within the discretion of an equity court, that discretion is not an arbitrary one, and where the contract is fair, reasonable and certain, it is as much a matter of course for a court of equity to decree specific performance as it is for a court of law to award damages for its breach; second, the fairness or hardship of a contract is to be determined as of the time when it is made, not on the basis of subsequent changes in conditions which may make it less beneficial to one party and more beneficial to the other than at the time when it was entered into. See (among many cases which might be cited): *Lissau v. Smith,* 215 Md. 538, 548-549, 138 A. 2d 381; and *Glendale Corporation v. Crawford,* 207 Md. 148, 154, 114 A. 2d 33 (where both rules are stated, though the first was found inapplicable), and the cases there cited.

Finding no basis on the issues presented for holding the appellant to be excused from the obligation to join in the execution of a deed to the appellee, we think the decree should be affirmed.

*Decree affirmed, with costs.*